THE WARFIELD GROUP, LLP
Ronald John Warfield [RJW-7620]
100 Park Avenue – 16th Floor
New York, New York 10017
Phone: (212) 880-2630
Facsimile: (212) 880-2632
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

| | |
|---|---|
| MÓNICA AVILA-BLUM, | **COMPLAINT** |
| *Plaintiff*, | **05 CV 6435** |
| -against- | **Jury Trial Demanded** |
| CASA DE CAMBIO DELGADO, INC., DELGADO TRAVEL AGENCY, INC. & HECTOR DELGADO, | **ECF Case** |
| *Defendants*. | |

-----------------------------------------------------------X

Plaintiff Mónica Avila-Blum ("Avila" or "Plaintiff"), by her attorneys, complaining of defendants Casa de Cambio Delgado, Inc., Delgado Travel Agency, Inc., and Hector Delgado, alleges as follows:

## NATURE OF ACTION

1.      This action is brought to remedy unlawful discrimination, interference, and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"). In violation of the FMLA, Defendant Casa De Cambio Delgado, Inc. ("Casa de Cambio") and Delgado Travel Agency, Inc. ("Delgado Travel"), (referred to herein as "Corporate Defendants") interfered with Avila's right to take time off for radiation therapy and summarily terminated her after she made a request for protected medical leave.

2. In violation of the New York Executive Law § 290, *et seq.* ("New York State Human Rights Law") and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-10, *et seq.* ("New York City Human Rights Law"), Defendants discriminated and retaliated against Avila on the basis of her sex. Specifically, Defendant Hector Delgado ("Delgado") subjected Avila to unwanted and opposed sexual advances and thus created a hostile work environment which substantially altered the terms and conditions of Avila's employment. Further, Defendants took tangible adverse employment actions against Avila when she opposed and complained about the sexual advances.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 2617(a) and 28 U.S.C. § 1331. Supplemental jurisdiction over Plaintiff's state and city law claims is conferred by 28 U.S.C. § 1367(a).

4. Venue is proper in this District under 28 U.S.C. §1391(b)(1) and (c) because all Defendants reside in New York and Corporate Defendants reside in this judicial district.

5. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and 2202.

## PARTIES

6. Plaintiff Mónica Avila-Blum is an adult female who resides in Queens County, New York.

7. Defendant Casa De Cambio is a New York corporation that conducts business in New York County. It maintains its corporate headquarters at 79-08 Roosevelt Avenue, Jackson Heights, New York 11372.

8. Defendant Delgado Travel, a New York corporation with over 20 branch offices in the metropolitan New York area, conducts business and maintains offices in New York County. Its corporate headquarters are located at 79-08 Roosevelt Avenue, Jackson Heights, New York 11372.

9. Defendant Hector Delgado resides in New York and is an individual engaged in business in the state of New York. Delgado is sued individually and in his capacity as the President, owner, officer and/or agent of Defendant Corporations.

10. Defendants are subject to the jurisdiction of this Court.

### FIRST CAUSE OF ACTION
### (Violation of the FMLA)

11. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

12. Avila was employed by Corporate Defendants from on or about March 2001 until on or about November 2004.

13. At all times material herein, Corporate Defendants were Avila's employer within the meaning of the FMLA.

14. Corporate Defendants are owned and operated by the Delgado family. Delgado's daughters Jeanette Delgado-Savino ("Jeanette") and Linda Delgado ("Linda") serve as owners, officers, directors, and/or managers of Defendant Corporations. Casa de Cambio and the related entities doing business as Delgado Travel constitute an integrated employer and employ 50 or more employees within a 75 mile radius. Corporate Defendants utilize a centralized control of labor relations to operate the various office locations and business entities.

15.     Avila is an eligible employee for the purposes of the FMLA, having worked for Corporate Defendants for at least 12 months and at least 1,250 hours during the 12-month period immediately preceding the start of her leave.

16.     On or about September 10, 2004, Dr. Nydick, an endocrinologist, ordered a blood sample from Avila in order to conduct a thyroid stimulating immunoglobulin test. On or about September 25, 2004, Dr. Nydick sent Avila a letter diagnosing her with hyperthyroidism, based on the results of the medical tests and recommended treatment with radioactive iodine.

17.     In the following days, Avila discussed her condition with Linda and Gloria Perez ("Perez"), and showed them a copy of Dr. Nydick's letter. Delgado became aware of Avila's condition at this time.

18.     On or about October 19, 2004, Avila submitted a written request to Delgado for time off on October 22, 2004 to attend her follow-up appointment with Dr. Nydick. Despite numerous inquiries, Delgado refused to approve make a decision on the request, eventually referring Avila to Linda. Linda grudgingly permitted Avila to take the time off, but reminded her that she would not be paid for the day.

19.     On Friday October 22, 2004, after discussing her options with Dr. Nydick, Avila elected to proceed with the radioactive iodine treatment. Dr. Nydick urged her to schedule an appointment with the hospital for the radioactive treatment as soon as possible to prevent her condition from worsening.

20.     On Monday October 25, 2004, Delgado called Avila into his office and began screaming at her due to her absence from work the previous Friday. He flatly stated that her employment would be in jeopardy if she took additional time off. When Avila attempted to explain her medical condition and the importance of the treatment, Delgado replied that he

needed a "healthy person" working with him. Finally, Delgado ordered Avila to work downstairs as a cashier in order to punish her for her absence.

21. On or about October 25, 2004, Avila informed Linda that she needed to take the week of November 29, 2004 off due to her medical condition. Avila explained that she would be measurably radioactive following her treatment and that her doctor recommended that she should avoid close contact with others for one week. On or about October 27, 2004, Avila notified Delgado of her request for time off in a similar conversation.

22. In or around November 2004, Avila submitted her request for time off in writing to Delgado and also copied Linda, Jeannette and Perez. However, Delgado refused to approve the request and again threatened to fire her if she took the time off. Delgado told Avila that she had to choose between her job and her appointment.

23. Due to her thyroid condition, Avila was unable to work on November 26, 2004 and November 28, 2004. When she called the office to inform them of her illness, Linda stated that Delgado was furious and Avila would not be permitted to return to work without his approval.

24. When Avila returned to work with a doctor's note on Monday, November 29, 2004, Defendants told her that she was no longer permitted to work, and immediately directed her to Delgado's office. After waiting outside of his office for approximately one hour, Linda ordered her to "come back tomorrow." On Tuesday, November 30, 2004, Linda informed Avila that her father was not available and that she should come back the following day. On Wednesday, December 1, 2004, Linda finally informed Avila that her father was unwilling to reinstate her.

25. Despite knowledge of Avila's medical condition, Defendants interfered with, restrained, and/or denied her the exercise of or the attempt to exercise rights provided under the FMLA.

26. Defendants willfully, knowingly and or recklessly discriminated and retaliated against Avila by her by terminating her employment.

27. As a result of Defendants' discriminatory and retaliatory acts, Avila has suffered and will continue to suffer substantial losses, including loss of past and future earnings and has suffered other monetary damages and compensatory damages.

28. Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### New York State Executive Law

29. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

30. In or about March 2001, Defendants hired Avila as a cashier in the money exchange department and assigned her to work at one of the branch offices. In or about November 2001, Delgado personally selected Avila to work as his Executive Administrative Assistant and transferred her to company headquarters. Avila reported directly to Delgado, and her primary responsibilities were to manage his schedule, handle daily business affairs, and attend client meetings and presentations. Because of her proficiency in both English and Spanish, she also handled many customer service requests.

31. It was common knowledge among employees that Delgado engaged in sexual relationships with female employees in his private office. As a result, he would regularly transfer the women he deemed attractive from the branch offices to company headquarters. When Avila began working at the company headquarters, co-workers warned her about Delgado's predatory

sexual practices, informing her that he had a sexual affair with the former Executive Administrative Assistant whom Avila was hired to replace and that Delgado intended to pursue such a relationship with her.

32. Because her desk was located immediately outside of Delgado's office, Avila regularly observed individuals entering and leaving his office. On a weekly basis, Avila witnessed female employees enter Delgado's office, and after a period of time when the music would be turned up loudly to muffle a sexual encounter, they would emerge disheveled, with their hair in disarray, make-up smeared, and clothing wrinkled. Prior to each of these encounters, Delgado instructed Avila that he was not to be disturbed. On one occasion, Merina, a female co-worker walked out of Delgado's office crying and told Avila that Delgado had touched and grabbed her.

33. In addition, Delgado also organized parties in his office, where he would play loud music, provide alcohol, and invite female employees to drink and dance with him. The hostile environment interfered with Avila's ability to complete her work.

34. Delgado made no effort to conceal his sexual activity and, in fact, flaunted the potential benefits of engaging in such an affair with him. It was common knowledge that he rewarded female employees who acquiesced to his advances with gifts of jewelry and clothing, as well as greater employment benefits, such as raises, increased time off, and preferential treatment. Furthermore, Delgado specifically ensured that Avila was aware of his sexual proclivity, sending her to purchase Viagara on his behalf.

35. Delgado would regularly attempt to flirt with Avila and lavish her with compliments about her appearance, often telling her to wear shorter skirts. On multiple occasions, Delgado offered to pay for Avila's gym membership and visits to the beauty salon.

36. Delgado would often create opportunities to touch her, "accidentally" or subtlety touching her buttocks, pinching her waist, brushing up against her, putting his arm around her, or grazing her arm. Avila opposed and objected to such advances and would cut him off in a very professional manner.

37. In February 2002, when Avila approached Delgado in his office to discuss whether he would re-hire her sister, Mr. Deglado put his arm around her and began stroking her hand. Avila, shocked and offended, unequivocally backed away and withdrew, and in response, Delgado abruptly ended the meeting. Not surprisingly, Avila's sister did not get the job.

38. In March 2002, when his wife was in Mexico, Deglado approached Avila in a flirtatious manner and invited her to have dinner with him, telling her that he was "really lonely." Again, Avila clearly and unequivocally turned him down.

39. In August 2002, Delgado held Avila captive on a six-hour boat ride and again sexually harassed her. Delgado lured Avila to the boat by asking her to deliver an "important" set of documents from the office to his home in Freeport. When Avila arrived and found him on the boat, Delgado ordered her to come aboard so she could hand the documents to him directly. Once Avila stepped aboard, the boat left the dock, and despite her numerous requests, Delgado refused to return Avila to shore. During the boat ride, Delgado constantly stared at Avila and repeatedly demanded her to take her clothes off and change into shorts and a t-shirt that he had selected for her. Avila once again refused and spent the remainder of the trip in the cabin below deck.

40. Delgado also assigned Avila tasks that were designed solely for his own sexual gratification and to exhibit his dominion over her. For instance, after having a few drinks during lunch, he would order Avila to organize and rearrange boxes in the walk-in storage closet outside

his office so he could watch her from behind. On another occasion, Delgado, as an excuse to stare at Avila while she was bending over and stretching her arms, directed her to arrange and display marketing posters on the floor and around the office for his review.

41.     In Avila formally complained to Jeanette and Linda, stating that she found Delgado's behavior and sexual advances offensive, and requested for it to stop. However, Delgado continued to treat Avila in a harassing manner.

42.     Due to her continual refusals of his advances and complaints, Delgado took numerous adverse employment actions against Avila. In May 2003, Delgado demoted her to the position of receptionist, humiliating her in front of other employees. Unlike her Executive Administrative Assistant position, where she would handle matters of importance and meet with high-profile business contacts, such as the President of Ecuador, Avila performed menial tasks as a receptionist.

43.     In addition, Delgado harassed her, ordered her not to speak to people, scrutinized and monitored her movements and work, screamed vulgarities at her, and humiliated her in front of other employees. For example, Delgado spent an inordinate amount of time degrading and demeaning Avila during internal company meetings and falsely accused her of not performing her job properly. Despite the abuse and harassment, however, Avila continued to complete her job assignments professionally and responsibly.

44.     After Delgado reinstated Avila to her prior position as Executive Administrative Assistant in or about October 2003, he made yet another sexual advance towards her. That evening, Delgado held a small party in his office with other women, and requested Avila to serve them whiskey. After the other women had left, Delgado, who was intoxicated, called Avila into his office and began leering at her and undressing her with his eyes. After focusing on Avila's

legs and commenting on them, Delgado moved towards Avila and attempted to touch her. Avila ran out of his office and immediately reported the incident to Perez, who did not seem surprised by the complaint. Perez was powerless to assist, admitting that she feared Delgado when he was drunk. Instead of taking action to eliminate the harassment, Perez merely told Avila to avoid Delgado.

45. In January 2004, Patricia Espinoza, a co-worker, informed Avila that Delgado had sexually harassed her during his company-sponsored birthday party. Espinoza stated that Delgado, pretending to be drunk, told her about his sexual fantasies, asked her to go back to his office with him, and grabbed her breasts.

46. Despite Avila's numerous and specific complaints to Linda and Jeanette, Corporate Defendants did not take any steps to eliminate the harassment, and Delgado continued to make advances towards her.

47. Defendants terminated Avila because she opposed, objected, and complained about Delgado's sexual advances.

48. Defendants are employers within the meaning of the New York State Human Rights Law.

49. Defendants discriminated against Avila on the basis of her sex by creating a hostile work environment and retaliated against her for reporting and opposing the sexual harassment.

50. Defendant Hector Delgado directly participated in, aided and abetted the unlawful discrimination against Plaintiff on the basis of her sex.

51. The acts and omissions alleged herein were reckless, malicious, and made with callous disregard and deliberate indifference to Plaintiff's rights.

52. As a result of Defendants' acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other reemployment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation.

53. Plaintiff has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### The New York City Human Rights Law

54. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

55. Defendants are employers within the meaning of the New York City Human Rights Law.

56. In violation of the New York City Human Rights Law, Defendants intentionally discriminated against Plaintiff by subjecting her to disparate treatment on account of her sex and/or perceived disability by denying her the more favorable compensation, terms, conditions, and privileges of employment enjoyed by similarly situated employees.

57. Defendant Hector Delgado directly participated in, aided and abetted the unlawful discrimination against Plaintiff on the basis of her sex.

58. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other reemployment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, and humiliation.

59. Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Avila respectfully demands judgment against Defendants awarding her the following:

(a) Back pay, in an amount to be determined at trial; front pay, including the value of all benefits, an equal amount as liquidated damages, and compensatory damages pursuant to the FMLA;

(b) For Second and Third Causes of Action, compensatory damages in an amount, not less than $500,000, to be determined at trial;

(c) For the Third Cause of Action, Punitive damages, in an amount, not less than $1,000,000, to be determined at trial; and

(d) The costs of this action, interest, and reasonable attorneys' fees, together with the costs and expenses incurred in this action;

Together with such additional relief as the court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: New York, New York
       July 13, 2005

THE WARFIELD GROUP, LLP

By: _____
    Ronald John Warfield [RJW-7620]
    100 Park Avenue – 16th Floor
    New York, New York 10017
    Tel:   (212) 880-2630
    Fax:   (212) 880-2632
    *Attorneys for Plaintiff*